973 F.2d 295
 Robert P. MACIARIELLO; Arnold Rowell, Plaintiffs-Appellees,
v.
W.B. SUMNER, Chief of Police, in his individual and official
capacity; Paul S. Paskoff, Lancaster City
Administrator, in his individual and
official capacity, Defendants-Appellants,
and
City of Lancaster; City of Lancaster Police Department, Defendants.
Robert P. MACIARIELLO; Arnold Rowell, Plaintiffs-Appellees,
v.
CITY OF LANCASTER; City of Lancaster Police Department, W.
B. Sumner, Chief of Police, in his individual and official
capacity; Paul S. Paskoff, Lancaster City Administrator, in
his individual and official capacity, Defendants-Appellants.
 Nos. 91-1226, 91-1268.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 8, 1992.
Decided Aug. 18, 1992.
 
 Vance J. Bettis, Gignilliat, Savitz & Bettis, Columbia, S.C. (Linda Pearce Edwards, on brief), for defendants-appellants.
 Sharon McCain Rickborn, Columbia, S.C., for plaintiffs-appellees.
 Before HALL and SPROUSE, Circuit Judges, and KIDD, Senior United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Robert Maciarello and Daryl Rowell are former officers of the Lancaster, South Carolina, city police department. They brought this action, alleging two claims under state law and one, alleging an infringement of free speech, under 42 U.S.C. § 1983. The defendants are W.B. Sumner, the chief of police; Paul Paskoff, the city administrator; the city; and the police department. Plaintiffs sought money damages only.
 
 
 2
 Following discovery, all parties moved for summary judgment. The district court granted summary judgment for the defendants on the state law claims, but denied it on the § 1983 claim. The plaintiffs' motion was denied in its entirety. Because their motion was based on qualified immunity, Sumner and Paskoff noted an immediate appeal to this court. On subsequent motion of the defendants, the district court certified for interlocutory appeal its order denying summary judgment to the city and police department. The district court found that the denial of summary judgment rested on a controlling question of law--whether the plaintiffs' actions in investigating alleged wrongdoing by their superior officer constituted protected speech--as to which there is substantial ground for difference of opinion, and that immediate appeal may materially advance the termination of the litigation. See 28 U.S.C. § 1292(b). We then granted leave to appeal, and all defendants are before us. We conclude that Sumner and Paskoff are entitled to qualified immunity and that there is no evidence of a custom or policy of the governmental entities that caused the supposed constitutional violation. Therefore, we reverse and remand with instructions to enter summary judgment for the defendants.
 
 I.
 
 3
 In May 1987, plaintiff Rowell, then a Sergeant in the Lancaster force, arrested Shawn Scott for driving under the influence of alcohol. Pursuant to department policy, Scott was videotaped as he took a breathalyzer test. Several weeks later, Susan Howle, Scott's sister and Rowell's co-worker, asked Rowell to drop the charge against her brother. Intending to comply with this request, Rowell spoke to Municipal Court Judge Helen Sowell. Judge Sowell informed him that Captain Robert Broach, the patrol commander and third in command, had already approached her about the case. Broach had told her that the tape "wasn't any good." Rowell was confident that the tape was in good condition when it was received in the evidence room, and he suspected that Broach may have altered it. Rowell reported his suspicion to plaintiff Maciariello, a lieutenant and Rowell's immediate supervisor.
 
 
 4
 Rowell and Maciariello went to the evidence room to find out whether Broach had checked out the tape. The supervisor of the evidence room, Captain Bailey, stated that he had given the video to Broach, but the chain of evidence log did not show any such transaction. Rowell and Maciariello then viewed the tape and discovered that there was only sound, and no picture, recorded.
 
 
 5
 As a part of larger infighting at the Lancaster department, Maciarello and Rowell had had a long history of conflict with Broach. Seeing a chance to advance their cause, they decided to conduct an investigation of Broach without reporting their suspicions to the Assistant Chief of Police or the Chief of Police, in whom they had little trust.
 
 
 6
 At Maciariello's suggestion, Rowell returned to Judge Sowell with a hidden tape recorder. Sowell repeated that she assumed Broach had seen the Scott tape because of statements he had made to her. Rowell told Judge Sowell of his suspicions about Broach. The judge told Rowell to talk to the city solicitor and to "keep [her] out of this."
 
 
 7
 Rowell and Maciariello also asked a videotape expert whether the picture on a tape could be erased without affecting the sound. They were told that it could be done easily.
 
 
 8
 In mid-August, Assistant Chief Harris overheard Rowell and Maciariello as they discussed their clandestine activities. After confronting them about the matter, Harris requested that Chief Sumner initiate an internal investigation. Chief Sumner appointed Lieutenant Balkcum of the Detective Division to conduct an internal review. Balkcum's final report concluded that Broach engaged in no wrongdoing. As Rowell and Maciarello would have quickly learned had they reported their suspicions earlier, the video camera Rowell used to tape the Scott arrest had malfunctioned, and the Scott tape was one of at least six on which there was no picture.
 
 
 9
 Chief Sumner decided to demote Rowell and Maciariello for failing to report their suspicions prior to undertaking their "devious" private investigation. Upon learning of their demotions, Rowell and Maciariello went to Paul Paskoff, the City Administrator. After talking with Paskoff, both men placed their badges on his desk and resigned.[1] They filed grievances concerning their demotions. Though the initial hearing board ruled for Rowell and Maciarello, Sumner overruled the board, and the Lancaster City Council upheld the demotions.
 
 
 10
 Nearly three years later, in March, 1990, Rowell and Maciariello filed this action. The only claim before us today is their assertion that their first amendment right to freedom of speech was violated by their demotions. In denying summary judgment for Sumner and Paskoff, the district court ruled that the law regarding retaliation for First Amendment activity is clearly established and that the "defense of qualified immunity does not pertain to this case." Sumner and Paskoff's appeal of the denial of summary judgment is based on qualified immunity, and we have jurisdiction under Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985). As we related above, the defendant governmental entities have appealed the same order through § 1292(b) certification.II.
 
 
 11
 Governmental officials performing discretionary functions are shielded from liability for money damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Moreover, there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent. Tarantino v. Baker, 825 F.2d 772, 774-75 (4th Cir.1987), cert. denied, 489 U.S. 1010, 109 S.Ct. 1117, 103 L.Ed.2d 180 (1989). Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines. Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Gooden v. Howard County, 954 F.2d 960, 968 (4th Cir.1992) (en banc). The Anderson Court explained (483 U.S. at 639-40, 107 S.Ct. at 3039, cite omitted):
 
 
 12
 [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless that very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 13
 In light of this rule, the judgment below must be error or paradox. The district court held that the law relating to retaliation against public employees for exercise of free speech was clearly established at the time of plaintiffs' demotions. As to the broad proposition of law, we agree.[2] On the other hand, the premise of the § 1292(b) certification--that reasonable minds may differ over whether Rowell and Maciarello engaged in protected speech--would, if correct, strongly support Sumner and Paskoff's qualified immunity defense. In any event, the premise may be wrong, and, as plaintiffs argue, their right to be free of discipline for informally investigating a fellow officer may be clearly established; hence, we must examine the merits of the constitutional claim.
 
 III.
 
 14
 A threshold question is whether any of Rowell and Maciariello's actions constituted "speech." Appellants argue that the investigation constituted conduct and not speech. They rely on Dennison v. County of Frederick, 921 F.2d 50 (4th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2828, 115 L.Ed.2d 998 (1991). In Dennison, the plaintiff alleged that he was constructively discharged in violation of his First Amendment rights. We held that Dennison's First Amendment right to freedom of speech could not have been violated because there was no particular speech for which he was punished. Instead, he was discharged after a dispute over a general course of conduct. Although we recognized in Dennison that "speech" within the meaning of the First Amendment includes more than the spoken or written word, we noted also that not all conduct can be labeled speech just because the actor intends thereby to express an idea. Id. at 53-54; United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
 
 
 15
 We easily conclude that the investigation itself was not "speech." The investigation did not express, and was not intended to express, anything to anyone; its central feature was secrecy. Rowell and Maciarello deliberately chose not to speak, and they hid their activities so that those activities would not convey a message to an observer. Though they claim that they intended to speak out eventually, their intention expresses nothing. A hen may intend to lay an egg someday, but the omelet must await it.
 
 
 16
 In a much more narrow sense, some "speech" undoubtedly occurred. Rowell and Maciariello discussed their suspicions with Judge Sowell and with each other. Speech on matters of public concern is protected even though it occurs in a private setting. Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).[3]
 
 
 17
 We conclude that the investigative activities per se of Rowell and Maciariello did not constitute "speech," but that they did engage in some protected conduct in discussing their suspicions with Sowell and one another.
 
 IV.
 
 18
 Though plaintiffs' claim, greatly pruned, survives the "speech" test, fatal hurdles await it. The protected speech must have been a "but for" cause of the discharge or demotion. Jurgensen v. Fairfax County, 745 F.2d 868, 880 (4th Cir.1984); Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576.
 
 
 19
 There is no evidence from which a reasonable trier of fact could find that plaintiffs were disciplined for stating their suspicions to one another; instead, they were demoted for not stating their suspicions to someone in authority. Likewise, they were not demoted for revealing the possible evidence tampering to Judge Sowell, but rather for surreptitiously taping a conversation with her.
 
 
 20
 Although Chief Sumner's demotion letters to Rowell and Maciariello refer to their "allegations" against Broach, this word, in context, broadly refers to the whole sorry affair. The letters clearly explain that Rowell and Maciariello were being demoted for "unprofessional and devious" conduct. In particular, the recording of Sowell's conversation, conduct that Sumner considered highly unprofessional and an invasion of the judge's privacy, was an important factor in Sumner's decision.
 
 
 21
 The "speech" here is so limited, and the non-"speech" cause for the discipline so overwhelmingly and lucidly established, that no reasonable trier of fact could find the speech a "but for" cause of the demotions.
 
 V.
 
 22
 Rowell's statement of his suspicions to Judge Sowell is "speech" but not a "but for" cause of the demotions; the larger investigation may be a "but for" cause, but it is not "speech." Even if these defects were repaired, plaintiffs would lose if their interest as a citizen in the "speech" is outweighed by the government's interest as employer. The test for striking this balance was developed in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).[4]
 
 
 23
 [T]he First Amendment guarantee of free speech is not absolute ... particularly so in the case of public employees, since "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."
 
 
 24
 Jurgensen, 745 F.2d at 878, quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734 (1968) (citation omitted). Consequently, we strive to balance the right of the employee to comment on matters of public interest and the right of the public employer to promote the efficiency of public services. Id. at 878-79.
 
 
 25
 The first step is to determine the extent to which the speech touches on a matter of public concern. We agree with the district court that an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested. However, Rowell and Maciarello's deposition testimony clearly shows that personal animosity motivated them to undertake the secret investigation. This motivation detracts somewhat from their professed interest in exposing official corruption. See McMurphy v. City of Flushing, 802 F.2d 191, 197-98 (6th Cir.1986) (court properly considered personal vendetta as basis for unauthorized investigation, rather than sincere effort to expose official corruption).
 
 
 26
 Second, the court must consider "the nature of the employee's job ... [and the] possible effect of his action on employee morale, discipline or efficiency." Jurgensen, 745 F.2d at 880. In this regard, the court must evaluate the employer's interest in maintaining efficiency, integrity and discipline. This interest is viewed as if on a spectrum "from university professors at one end to policemen at the other." Id. Police are at the restricted end of the spectrum because they are "paramilitary"--discipline is demanded, and freedom must be correspondingly denied. Id.; Hughes v. Whitmer, 714 F.2d 1407, 1418 (8th Cir.1983), cert. denied, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); cf. Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (police department's interest in discipline, esprit de corps, and uniformity was sufficient state interest to defeat due process challenge to hair grooming regulations). Consequently, greater latitude is afforded to police department officials in dealing with dissension in their ranks. Hughes, 714 F.2d at 1419.
 
 
 27
 A police department has an undeniable interest in discouraging unofficial internal investigations. If personal investigations were the usual way for an officer to check out suspicious activities of a fellow officer, the effect on efficiency and morale could be very disrupting, and the effectiveness of the police force might deteriorate. Instead of concentrating on their traditional duties in the community, officers with personal hostilities could become preoccupied with personal investigations of one another. Esprit de corps could collapse into a kafkaesque nightmare of improper investigations into the impropriety of improper investigations.
 
 
 28
 When we balance the competing interests under Pickering and Connick, we do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was "reasonably to be apprehended." Jurgensen, 745 F.2d at 879. In this case, one of the express grounds for the demotions was that "the morale of the Lancaster Police Department has been damaged." Whether there was any concrete evidence that morale was disrupted or not, the potential for disruption is self-evident.
 
 
 29
 In summary, the unlawfulness of Sumner's and Paskoff's actions was not only not "apparent," but also nonexistent. Consequently, they are entitled to qualified immunity. Though the governmental entities are not entitled to qualified immunity, the underlying conduct was lawful; even if it were not, plaintiffs utterly failed to prove the existence of a custom or policy of the city or police department that caused the underlying conduct. Liability under 42 U.S.C. § 1983 does not extend to the public coffers through mere respondeat superior. Monell v. Dep't of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); Gordon v. Kidd, 971 F.2d 1087 (4th Cir.1992).
 
 
 30
 For these many reasons, we reverse and remand with instructions to enter summary judgment for the defendants.
 
 
 31
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Under city policy, a resignation "in good standing" must be made to an employee's department head; hence, the resignations to Paskoff were unofficial, and the plaintiffs were terminated when they failed to report to work. Though the circumstances of the resignation/termination receive some space in the briefs and a great deal in discovery, neither side has attached any significance to them
 
 
 [2]
 The fundamentals of this area of the law were developed in a fifteen-year line of cases, the most notable of which were Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)
 
 
 [3]
 The plaintiffs also spoke to the video expert and Bailey in conducting their investigation. However, in neither of these conversations was their suspicion of Broach conveyed
 
 
 [4]
 This court has had several opportunities to apply the test in the context of public employment since Connick was decided. See Dwyer v. Smith, 867 F.2d 184 (4th Cir.1989); Joyner v. Lancaster, 815 F.2d 20 (4th Cir.), cert. denied, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987); Jurgensen, 745 F.2d 868; and Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984)